**In re Marie WEBB, Debtor.**

**Marie WEBB, Plaintiff,**

v.

**PHILADELPHIA GAS WORKS, Philadelphia Facilities Management Corporation and James J. O'Connell, Esquire, Defendants.**

**Bankruptcy No. 83–03458K.
Adv. No. 83–2325K.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 27, 1984.

**542**

David Sambolin, Philadelphia, Pa., for debtor.

James M. White, John F. Egan, Philadelphia, Pa., for PGW and Phila. Facilities Management Corp.

James J. O'Connell, Philadelphia, Pa., defendant/trustee.

## OPINION

WILLIAM A. KING, Jr., Bankruptcy Judge.

This case reaches the Court on a complaint for an injunction filed by the debtor against Philadelphia Gas Works ("PGW"). After filing for relief under the Bankruptcy Code, the debtor sought restoration of gas service to her home and offered the utility company a security deposit pursuant to § 366 of the Code. PGW refused to accept the amount offered or restore service because there was evidence of illegal tampering with PGW equipment and receipt of stolen gas at the debtor's premises prior to the bankruptcy filing.

The debtor claims that PGW's policy of requiring voluntary restitution in cases of gas tampering and stolen gas violates §§ 366 and 525 of the Code. The position of PGW is that a debtor who tampers with equipment, thereby endangering not only herself but the safety of the entire neighborhood, should not be afforded the protections and remedies normally available under § 366 to debtors who do not tamper.

For the reasons stated herein, we will grant the motion of PGW to dismiss the complaint and deny the debtor's request for injunctive relief.[1]

### FACTS

The gas service of the debtor was initially terminated by PGW on April 25, 1983 for failure to pay arrearages of $1,035.92.[2] The method used by PGW to terminate service was to shut off the gas connection to the debtor's home at the curbbox valve.

On May 21, 1983, a PGW representative discovered that the service valve in the curbbox had been turned into an "on" posi-

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Rules of Bankruptcy Procedure.

2. N.T. p. 30.

tion and that the debtor was receiving stolen gas.[3] The representative shut off the valve for a second time and reported his findings to supervisors at PGW. On June 8, 1983, another PGW employee found that the debtor's gas service had been illegally turned on again.[4] He attempted to gain access to the debtor's home to inspect the meter and gas pipings for safety reasons, but was unsuccessful. On June 10, 1983, a PGW crew excavated the street in front of the debtor's home and permanently shut off the gas at the gas main connection in order to prevent future tampering.[5]

The debtor filed for protection under Chapter 7 of the Bankruptcy Code on September 2, 1983 and converted the case to one under Chapter 13 on September 12, 1983. Pursuant to § 366(b) of the Code, the debtor offered to pay a security deposit of $162.00 and a reconnection fee of $20.00 in order to have PGW reconnect gas service to her home. Section 366(b) provides:

> Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.

Section 366(a) provides:

> Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

When PGW refused to restore service for the amount offered, the debtor filed the instant complaint against PGW. We did not issue a temporary restraining order, although one was requested by the debtor on December 13, 1983, because there was an insufficient showing of irreparable harm

in order to merit the granting of such extraordinary relief.

At trial on the preliminary injunction, the debtor did not refute the testimony of PGW's witnesses concerning tampering and unauthorized gas usage. Debtor's counsel focused on presenting to the Court a description of PGW's policy in tampering cases from the testimony of a PGW employee. That policy is to refuse to restore gas service unless the customer makes voluntary restitution of certain costs incurred by PG" because of the tampering, such as excavation charges and the cost of the unauthorized gas used.[6] PGW policy toward tampering is the same regardless of whether the customer files for bankruptcy. Furthermore, no assurances are made to the customer that gas service will be reconnected even if restitution is made.[7]

The debtor says she was informed by a PGW employee that her service would be restored if she paid $246.00 in digging charges, $60.32 for unauthorized gas usage, plus a security deposit and turn-on charge. She also offered proof that PGW restored service to other customers when they paid all of the charges surrounding their alleged tampering with PGW equipment. Therefore, the debtor contends, PGW's policy is discriminatory because payment of these pre-petition costs which would otherwise be dischargeable under Chapter 13 is the only thing which separates her from the class of other "tampering" customers who have had their service restored. PGW's policy, the debtor argues, is in effect a refusal to restore service on the basis of an unpaid pre-petition debt which violates §§ 366 and 525 of the Code.

PGW contends that no monetary demands were made on the debtor after the petition was filed and that it is incorrect to state that payment of these charges will automatically entitle a person who has tampered or used unauthorized gas to restored service. The final decision to restore ser-

---

3.  *Id.* pp. 33–34.

4.  *Id.* pp. 35–36.

5.  *Id.* p. 39.

6.  *Id.* p. 12.

7.  *Id.* p. 13.

vice, according to PGW, is based on a management evaluation of the safety factors involved.[8]

PGW asks the Court to take notice of the dangers involved in gas tampering, particularly in Philadelphia where most homes are situated in row formations. Every time an unauthorized person tampers with PGW gas lines and equipment, there is a risk of explosion. Therefore, PGW suggests that any decision regarding the restoration of service in tampering and theft cases should be within its discretion as a public utility supervised by the Philadelphia Gas Commission with a strong duty to insure the public health, safety and welfare.

Other facts produced at trial are that the debtor suffers from a medical disability and receives Supplemental Security income and welfare to provide for herself and her daughter. Since her gas service was terminated last June, the debtor's electric bills have increased because she must boil water on an electric hotplate to get hot water. She has depended on a kerosene heater to heat her home during the recent winter months which she claims is inadequate. As a result of the lack of heat, she and her daughter have been in poor health, further aggravating her disability. She also fears permanent damage to her water and sewer systems as a result of the lack of gas heat. It is on the basis of these factors that the debtor seeks to prove irreparable harm if injunctive relief is not obtained against PGW.

## CONCLUSIONS OF LAW

The appropriate standard for the issue of a preliminary injunction has been stated by the Third Circuit as follows:

This Court has consistently identified four factors which must be examined in ascertaining the propriety of a preliminary injunction... The moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the moving party will be irreparably injured *pendente lite* if relief is not granted...

Moreover, while the burden rests upon the moving party to make these two requisite showings, the District Court 'should take into account when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest'...

While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a 'delicate balancing' of all elements.

*Eli Lilly and Co. v. Premo Pharmaceutical Labs*, 630 F.2d 120, 136 (3d Cir.1980) *citing Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–15 (3d Cir.1978).

In applying the first of the four (4) factors mentioned above to the case at bench, we find that the debtor has not succeeded in proving a likelihood of success on the merits.

The general rule as stated in § 366(a) is that a utility company may not refuse service to a debtor *solely* on the basis of an unpaid prepetition debt. The insertion of the word "solely" into the statutory language of subsection (a) implies that there may be other grounds for the utility to refuse to furnish service. Another bankruptcy court has already so held:

In essence, a utility has the discretion to refuse service to any debtor for any reason which would validly constitute a ground for refusal if that debtor were not in bankruptcy, with the single exception of nonpayment for past services.

*Hennen v. Dayton Power & Light Co.*, 17 B.R. 720, 724 (Bkrtcy.S.D.Ohio 1982).

Because of the safety factors involved, and the risks posed to the public by those who tamper with gas company equipment, we hold that tampering and unauthorized use of gas constitute valid grounds for refusal to restore gas service. Therefore, the duties imposed by § 366 of

---

**8.** Memorandum of law of defendant, p. 3.

the Code on utility companies do not apply where the utility is able to prove that tampering and/or unauthorized gas usage took place on the debtor's premises within a reasonable time period prior to the debtor's request for reinstitution of service.

We note that our colleague, Judge Goldhaber, reached the same result in a bankruptcy case involving similar facts.[9] Judge Goldhaber granted the gas company's motion to dismiss the debtor's complaint when PGW produced evidence of tampering and gas theft.

For the same reason that § 366 is not applicable to the debtor's case, we also find that § 525 is inapplicable to the case at bench. Simply stated, § 525 states that while the average creditor may choose not to have future dealings with a debtor on the basis of prepetition debts, a governmental unit may not so discriminate solely on the basis of pre-petition debts. We have already determined that PGW's refusal to restore service is based on gas tampering and gas theft, and not solely on the basis of the debtor's pre-petition delinquency. Therefore, we conclude that there has been no violation of § 525 by PGW in this case.

Having found that the debtor is unlikely to eventually succeed on the merits of her claim that PGW has violated § 366 or § 525 of the Code, we have only to examine whether the second element essential to the issuance of a preliminary injunction, that is, irreparable harm, can be found on the basis of the facts presented in this case.

The debtor urges us to find irreparable harm from a combination of factors including her disability, the danger to her health and her daughter's health from lack of an adequate heat supply, increased electric bills, and the possibility of damage to her sewer and water systems.

We are not unsympathetic to the difficulties experienced by the debtor in trying to run a household which operates on gas heat without gas service. However, none of these factors rises to the level of irreparable harm necessary to require the issuance of an injunction. The debtor does have an alternate source of heat available and the present conditions complained of have existed for almost nine (9) months. Furthermore, the debtor is not without a forum. She may take her claims to the Philadelphia Gas Commission, the regulatory body which oversees PGW, and seek relief there. Finally, we believe the debtor's difficulties are due to her own course of conduct rather than PGW's denial of a service to which the debtor is rightfully entitled.

In conclusion, the seriousness of the debtor's conduct and the danger to the public interest posed by this conduct far outweigh the degree of harm suffered by the debtor due to lack of gas service. We find the debtor has failed to meet the burden of proving irreparable harm.

Our decision in this case is founded on public policy considerations. The gas company is far better equipped than this Court to decide the safety issues and take the risks involved in restoring gas service to a customer with a known propensity for tampering. Even though there may be no present danger of tampering if the debtor's service is restored by PGW, there is the possibility that the debtor will resort to tampering sometime in the future if she cannot afford to make payments to PGW. Therefore, we consider safety to be the paramount issue in this case and we do not believe the Bankruptcy Court should order a public utility to restore service in cases of tampering when that utility is under a duty to maintain the public's safety and welfare.

**9.** *Sara E. Neely,* Bankruptcy No. 83–03564G, Adversary No. 83–2224G.