In re Josephine and Daniel BEGLEY.

Josephine and Daniel BEGLEY, et al.

v.

PHILADELPHIA ELECTRIC COMPANY, Pennsylvania Public Utility Commission, et al.

Civ. A. No. 83–4657.
Bankruptcy No. 82–02461K.
Adv. No. 83–3102K.

United States District Court,
E.D. Pennsylvania.

Sept. 28, 1984.

Michael Donahue, Delaware County Legal Assistance Assn., Chester, Pa., for plaintiffs.

Kevin W. Gibson, Philadelphia, Pa., for defendant Philadelphia Elec. Co.

Alphonso Arnold, Jr., Asst. Counsel, Pennsylvania Public Utility Com'n, Harris-

burg, Pa., for Pennsylvania Public Utility Com'n.

## MEMORANDUM

LOUIS H. POLLAK, Judge.

## I. INTRODUCTION

As explained more fully below, the regulations of the Pennsylvania Public Utility Commission ("PUC") impose certain obligations upon a public utility which seeks to terminate a residential utility customer because the customer has not paid his or her utility bills. Among these obligations is a requirement that the utility use its "good faith and fair judgment in attempting to enter a reasonable settlement or payment agreement. . . ." 52 Pa.Admin.Code § 56.-97(b) (Shepard's 1983). Thus, a Pennsylvania utility will usually not terminate a residential customer without making an effort to negotiate an agreement whereby the customer remains current on future utility bills and makes regular payments toward retiring his or her arrearage.

The PUC has an administrative procedure initiated by an "informal complaint" through which a customer who feels that a utility has not met its obligation to negotiate a payment agreement may seek to enforce the utility's obligation. However, since 1981 the PUC has held itself powerless to enforce the negotiation obligation through its informal complaint procedure when the utility customer has filed a petition in bankruptcy. The PUC has ruled that section 366 of the Bankruptcy Code [1] preempts its jurisdiction.

Plaintiffs here—Josephine and Daniel Begley [2]—have filed petitions under Chapter 7 of the Bankruptcy Code, 11 U.S.C. §§ 701–766. They have also accumulated arrearages in their payment for service from the Philadelphia Electric Company ("PECO") received after the date of their bankruptcy petition. PECO sought to terminate the Begleys' service without negotiating a payment agreement. The Begleys contested that termination by attempting to file an informal complaint with the PUC. The PUC, however, declined to act because the Begleys had filed under Chapter 7. Consequently, the Begleys commenced this action in the bankruptcy court challenging (1) PECO's position that it had no obligation to negotiate a payment agreement with them and (2) the PUC's position that the PUC could not exercise jurisdiction to enforce any obligation that the PUC's regulations imposed on PECO to negotiate such an agreement.

On April 11, 1984, I withdrew the reference of this matter from the bankruptcy court. As this case involves purely legal

---

1. Section 366 provides:

    (a) Except as provided in subsection (b) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

    (b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

    11 U.S.C. § 366. On June 11 I held that section 366(a) deals only with termination of utility service solely on the basis of an arrearage for pre-petition service. I further held that section 366(b) operates as an exception to section

366(a), so that it also only deals with terminations based upon *pre*-petition arrearages. Thus, I held that section 366 could have nothing to do with this case, a case which concerns a termination for accumulation of a *post*-petition utility arrearage. Therefore, I held that section 366 could not preempt the PUC's jurisdiction over plaintiff's informal complaint.

2. The initial complaint styled this as a class action. As yet, no class has been certified. I have reserved plaintiffs' petitions for class certification, filed in the bankruptcy court, for disposition, if necessary, following resolution of plaintiffs' and defendants' cross-motions for summary judgment. The initial complaint in this matter listed three named plaintiffs: Josephine Begley, Daniel Begley, and Margaret Jaworsky. Only the Begleys have pressed their claims here. Thus, in the event that I do not certify a class, only the Begleys shall have relief in this action.

issues, the parties renewed in this court cross-motions for summary judgment filed in the bankruptcy court. I heard argument on the cross-motions for summary judgment on June 1, 1984. On that date I announced from the bench that I disagreed with the PUC's view of the preemptive effect of section 366. In a Memorandum dated June 11, I explained my decision on the preemption question; in an accompanying Order I granted declaratory and injunctive relief against PECO.[3] However, I reserved two questions for disposition after further submissions by the parties. I first reserved the question whether the PUC's refusal to exercise its jurisdiction constituted a violation of the Bankruptcy Code's antidiscrimination provision, 11 U.S.C. § 525. I also reserved the question of the relief that I should properly grant against the PUC[4] in light of the Eleventh Amendment and my conclusion on the reserved section 525 issue.

### A. *Amortized Payment Agreements*

The Pennsylvania Public Utilities Code imposes two general restrictions upon a utility's right to terminate residential service. First, a utility may not terminate service on certain days of the week or on certain holidays. 66 Pa.Cons.Stat.Ann. § 1503(a) (Purdon 1979). Second, "the commission shall not authorize ... a public utility to discontinue ... for non-payment

3. The Memorandum and Order of June 11, 1984, included some somewhat inartful drafting. Paragraph 1 of the Order reads as follows:
   1. Plaintiff's motion for summary judgment on their claim for declaratory relief against the Philadelphia Electric Company is GRANTED. The Philadelphia Electric Company's cross-motion for summary judgment on that claim is DENIED.
   a. 11 U.S.C. § 366 is hereby DECLARED not to preempt any portion of 52 Pa.Admin.Code chap. 56 (Shepard's 1983) as applied to termination of a bankruptcy debtor's failure to pay for service rendered after the date of the order for relief in bankruptcy.
   b. Defendant Philadelphia Electric Company is ORDERED to negotiate an amortized payment agreement with plaintiffs Josephine and Daniel Begley in accordance with its obligation to do so under 52 Pa.Admin.Code § 56.-97(b) (Shepard's 1983).

of charges or for any other reason, the rendering of service without personally contacting the customer ...." *Id.,* § 1503(b). The PUC has authority to supplement these statutory provisions with "regulations and orders" restricting the utility's ability to terminate service. *See Id.,* § 1501.

The PUC has promulgated regulations concerning the provision and termination of service to residential utility customers. 52 Pa.Admin.Code chap. 56 (Shepard's 1983). These regulations prescribe limited situations in which a utility may terminate service. 52 Pa.Admin.Code § 56.81 (Shepard's 1983). A utility may, for example, terminate service for "[n]on-payment of an undisputed delinquent account" or for "[f]ailure to comply with the material terms of a settlement or payment agreement." 52 Pa. Admin.Code § 56.81(1), (5) (Shepard's 1983).

Such a termination must, of course, comply with the Public Utilities Code's notice requirement. 66 Pa.Cons.Stat.Ann. § 1503(b) (Purdon 1979). The PUC has elaborated upon this requirement. 52 Pa. Admin.Code §§ 56.91–56.100 (Shepard's 1983). In particular, section 56.97(b) imposes upon the utility a duty to negotiate a payment agreement in the event that a customer communicates with the utility after receiving notice of impending termination. Section 56.97(b) provides:

> Although the first sentence of this Order refers to a claim for declaratory relief only, plaintiffs had sought both declaratory relief and injunctive relief. The Order clearly granted both declaratory and injunctive relief against PECO, as one can see from the two sub-parts of paragraph 1 of that Order. The June 11, 1984, Memorandum recognized that the Order granted both forms of relief. *See In re Begley,* 41 B.R. 402, 407 (E.D.Pa.1984). The parties seem to have understood that I granted both forms of relief against PECO on June 11.

4. Plaintiffs' complaint asserts claims not only against the PUC but also against several PUC commissioners and other state officials. The parties have treated these defendants and the Commission collectively as the PUC. I have adopted this convention.

The utility, through its employes, shall exerise [sic] good faith and fair judgment in attempting to enter a reasonable settlement or payment agreement or otherwise equitably to resolve the matter. Factors to be taken into account when attempting to enter a reasonable settlement or payment agreement shall include but not be limited to the size of the unpaid balance, the ability of the ratepayer to pay, the payment history of the ratepayer and the length of time over which the bill accumulated.

52 Pa.Admin.Code § 56.97(b) (Shepard's 1983).

If the customer feels that the utility has not exercised good faith in attempting to negotiate a payment agreement, the customer may give notice of a dispute to the utility and the PUC, thereby invoking the PUC's jurisdiction. Upon receipt of a notice of dispute, the utility must stay the termination and must attempt to resolve the dispute without PUC intervention. *See* 52 Pa.Admin.Code § 56.141 (Shepard's 1983). This obligation includes a requirement that the utility "make a diligent attempt to negotiate a reasonable payment agreement if the ratepayer ... claims a temporary inability to pay an undisputed bill ...." 52 Pa.Admin.Code § 56.151(3) (Shepard's 1983). At the very least, the utility must prepare a report stating the nature of the dispute and the utility's position in regard to the dispute. 52 Pa.Admin. Code §§ 56.151(5), 56.152 (Shepard's 1983).

If the customer remains dissatisfied with the utility's negotiation efforts, the customer may file an informal complaint with the PUC. 52 Pa.Admin.Code § 56.161 (Shepard's 1983). Upon review of the utility's report, and after procedures ranging from informal conferences to more formal evidentiary hearings, the PUC will issue a decision. 52 Pa.Admin.Code § 56.163 (Shepard's 1983). Thus, the PUC may effectively require a utility to enter into an amortized payment agreement with a utility customer before terminating that customer for accumulating an unpaid arrearage.

The amortized payment agreement typically involves an agreement by the customer to remain current on his future utility bills and to pay a certain amount of his arrearage each month. If the customer defaults on a material provision of such an agreement, the utility may give notice and commence the termination procedure once again.

## B. *The PUC's Preemption Position*

The PUC has declined to exercise its jurisdiction to require utilities to negotiate payment agreements with customers who have petitioned for relief under the Bankruptcy Code during the pendency of the customer's bankruptcy case. The PUC even declines to exercise jurisdiction when the utility seeks to terminate the customer on the basis of unpaid bills incurred after the customer filed his bankruptcy petition in a chapter 7 case. It is the latter position which gave rise to this suit. The PUC has based its preemption position upon the language of 11 U.S.C. § 366(b), which the PUC has read as vesting exclusive jurisdiction in the bankruptcy court to require terms for termination of post-petition utility service to a debtor.

The PUC's position was first expressed authoritatively in *Anyanwu v. Philadelphia Electric Company,* 55 Pa.P.U.C. 221 (1981). *Anyanwu* involved a dispute between a chapter 13 debtor and PECO over a termination based upon the accumulation of a $1848.77 arrearage after the customer's petition in bankruptcy. The PUC held that:

[a]s provided by § 1471 of Title 28, United States Code, 28 USC § 1471, a United States district court and its bankruptcy court has jurisdiction over all civil proceedings arising under Title 11, and the bankruptcy court has exclusive jurisdiction of all property of the debtor, wherever located, as of the commencement of the proceeding. Thus, the complainant's filing of a petition for personal bankruptcy has preempted this commission from establishing any payment schedule with

respect to any amounts owed by the complainant to the respondent.

55 Pa.P.U.C. at 222.

The opinion in *Anyanwu* does not make entirely clear whether the PUC rooted its preemption analysis on section 366(b), a provision of the Bankruptcy Code applying across the board to bankruptcy proceedings generally, or whether the PUC was limiting its attention to chapter 13 bankruptcy. In this litigation, however, the PUC argues that its *Anyanwu* rule depends on section 366(b) and hence applies to a chapter 7 bankruptcy such as the Begleys'.[5] This view of *Anyanwu* is in accord with that taken by Administrative Law Judge Turner in *Plump v. Peoples Natural Gas Co.*, No. Z–8245057 (Pa.P.U.C. ALJ's decision March 15, 1984). In that decision, Judge Turner applied *Anyanwu* and held that section 366(b) "does deprive the Commission of jurisdiction over continuation of service and manner of payment of arrearages of [chapter 7] petitioners before the Bankruptcy Court . . . ." *Plump*, slip op. at 5–6 (citations omitted).

### C. *The June 11 Decision*

On June 11, 1984, I issued a Memorandum and Order which took a view of 11 U.S.C. § 366(b) different from that of the PUC. I reasoned that section 366 applies only to terminations based upon a pre-petition delinquency. The Begleys' case involves PECO's attempt to terminate their service on the basis of their *post*-petition arrearage. I therefore held that section 366 did not apply to the Begleys' dispute with PECO and hence that section 366 did not preclude the PUC from enforcing its regulations with respect to that dispute.

This holding led me to grant declaratory and mandatory relief against PECO. I declared that section 366 did not preempt any portion of 52 Pa.Admin.Code chap. 56 as applied to a dispute over a chapter 7 debtor's post-petition utility arrearage. I further ordered PECO to negotiate a payment agreement. By these actions I granted all of the relief to which plaintiffs are entitled from PECO.[6] On June 11, however, I did not grant any relief against the PUC.

Plaintiffs raise three claims against the PUC. First, plaintiffs seek (a) a declaration that with respect to the Begley-PECO dispute, section 366 does not preempt chapter 56 of the PUC's regulations, and (b) a mandatory injunction directing the PUC to follow chapter 56. Second, plaintiffs seek declaratory and mandatory relief against the PUC on the theory that, by declining to exercise jurisdiction over their informal complaint, the PUC violated the antidiscrimination section of the Bankruptcy Code, 11 U.S.C. § 525. Third, plaintiffs seek declaratory and mandatory relief against the PUC on the theory that, by violating section 525 of the Bankruptcy Code, the PUC also violated the Civil Rights Act of 1871, 42 U.S.C. § 1983.

On June 11 I held that even if the PUC had violated section 525, such a violation could not give rise to a viable claim under section 1983. *See Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Allegheny County Sanitary Authority v. United States Environmental Protection Agency,* 732 F.2d 1167 (3d Cir.1984) (*"ALCOSAN"*). I left for disposition today the question whether the PUC's determination that it lacked authority to enforce chapter 56 in chapter 7 bankruptcies violated 11 U.S.C. § 525. Because I decide below that the PUC's determination did not violate section 525, I must also decide whether I may award declaratory or injunctive relief against the PUC, in light of the Eleventh Amendment and the principles of comity

---

5. Chapter 13 proceedings involve adjustment of the debts of an individual with regular income. Chapter 13 cases consequently concern post-petition events. This case deals exclusively with PUC jurisdiction over post-petition utility arrearages of chapter 7 debtors. Chapter 7 cases involve straight liquidations and do not ordinarily deal with post-petition events.

6. On June 11, I also held that PECO had not violated either section 366 or section 362 by unilaterally applying the Begleys' section 366 security deposit to their post-petition arrearage.

addressed by the Supreme Court in *Pennhurst State School v. Halderman*, — U.S. —, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), and by our Court of Appeals in *ALCOSAN*.

## II. SECTION 525

Section 525 of the Bankruptcy Code prohibits governmental units from discriminating against bankruptcy debtors in the provision of certain benefits for the sole reason that the bankruptcy debtor has filed a bankruptcy petition. That section provides:

> Except as provided in Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499a–499s), the Packers and Stockyards Act, 1921 (7 U.S.C. 181–229), and section 1 of the Act entitled "An Act making appropriations for the Department of Agriculture for the fiscal year ending June 30, 1944, and for other purposes," approved July 12, 1943 (57 Stat. 422; 7 U.S.C. 204), a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

11 U.S.C. § 525.

Courts and commentators alike have looked to the legislative history of section 525 in an attempt to determine that section's meaning. *See, e.g., Duffey v. Dollison*, 734 F.2d 265, 270–271 (6th Cir.1984);

*Johnson v. Edinboro State College*, 728 F.2d 163, 164–165 (3d Cir.1984); *Henry v. Heyison*, 4 B.R. 437, 441–442 (E.D.Pa. 1980); *In re Richardson*, 15 B.R. 925, 928 (Bankr.E.D.Pa.1981), *rev'd on other grounds*, 27 B.R. 560 (E.D.Pa.1982); *In re Rose*, 23 B.R. 662, 666 (Bankr.D.Conn. 1982); Annot., 68 A.L.R.Fed. 137, 141 (1984) (Protection of Debtor from Acts of Discrimination by Governmental Units Under § 525 of Bankruptcy Code of 1978); 3 L. King, *Collier on Bankruptcy* ¶ 525.01 (15th ed. 1984). The House and Senate reports on the Bankruptcy Reform Act of 1978 include the same passage on section 525. It bears quotation at length:

> This section is additional debtor protection. It codifies the result of *Perez v. Campbell*, 402 U.S. 637 [91 S.Ct. 1704, 29 L.Ed.2d 233] (1971), which held that a State would frustrate the Congressional policy of a fresh start for a debtor if it were permitted to refuse to renew a drivers license because a tort judgment resulting from an automobile accident had been unpaid as a result of a discharge in bankruptcy.
>
> Notwithstanding any other laws, section 525 prohibits a governmental unit from denying, revoking, suspending, or refusing to renew a license, permit, charter, franchise, or other similar grant to, from conditioning such a grant to, from discrimination with respect to such a grant against, deny [*sic*] employment to, terminate [*sic*] the employment of, or discriminate [*sic*] with respect to employment against, a person that is or has been a debtor or that is or has been associated with a debtor. The prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of a debt discharged in the bankruptcy case (the *Perez* situation). It does not prohibit consideration of other factors, such as future financial responsibility or ability, and does not prohibit imposition of requirements such as

net capital rules, if applied nondiscriminatorily.

In addition, the section is not exhaustive. The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the *Perez* rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions, such as a State bar association or a medical society, or by other organizations that can seriously affect the debtors' livelihood or fresh start, such as exclusion from a union on the basis of discharge of a debt to the union's credit union.

The effect of the section, and of further interpretations of the *Perez* rule, is to strengthen the anti-reaffirmation policy found in section 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

The section is not so broad as a comparable section proposed by the Bankruptcy Commission, S.236, 94th Cong., 1st Sess. § 4–508 (1975), which would have extended the prohibition to any discrimination, even by private parties. Nevertheless, it is not limiting either, as noted. The courts will continue to mark the contours of the antidiscrimination provision in pursuit of sound bankruptcy policy.

S.Rep. No. 989, 95th Cong., 2d Sess. 81 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5867; H.R.Rep. No. 595, 95th Cong., 1st Sess. 366–367 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6322–6323.[7]

Congress, then, intended section 525 to permit courts to continue to develop a doctrine first announced by the Supreme Court in *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 223 (1971). *See Johnson v. Edinboro State College*, 728 F.2d 163, 165 (3d Cir.1984); *accord Duffey v. Dolli-*

son, 734 F.2d 265, 270 (6th Cir.1984). *Perez* involved a challenge to a section of the Arizona Motor Vehicle Safety Responsibility Act which precluded one from obtaining or retaining an Arizona driver's license if one had not satisfied an outstanding tort judgment arising out of an automobile accident. The Court construed the prior Bankruptcy Act as having a primary purpose "to give 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Perez*, 402 U.S. at 648, 91 S.Ct. at 1710–11 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). The Court concluded that the Arizona statute had the effect of "giving [judgment creditors] a powerful weapon with which to force bankrupts to pay their debts despite their discharge." 402 U.S. at 654, 91 S.Ct. at 1713. The Court held that the Bankruptcy Act precluded enforcement of the Arizona Act because the state statute conflicted with the purpose of the federal one.

Congress' codification of *Perez* in section 525 requires a plaintiff to demonstrate three elements in order to establish that a defendant has violated section 525. *First,* the defendant must be a "governmental unit." Both the Senate and House reports distinguish "governmental or quasi-governmental organizations" from "private parties," the subject of a rejected proposal's prohibition. *Second,* "[t]he prohibition extends only to discrimination or other action based solely on the basis of the bankruptcy, on the basis of insolvency before or during bankruptcy prior to a determination of discharge, or on the basis of nonpayment of debt discharged in the bankruptcy case...." *Third,* the discrimination must have been in the provision of "a license, permit, charter, franchise, or similar grant" or in the provision of public employment.

### A. *Governmental Unit*

■ For purposes of the Bankruptcy Code, "'governmental unit' means United

---

7. The House report cites the Bankruptcy Commission proposal as H.R. 31 94th Cong., 1st

Sess. § 4–508 (1975). In all other respects, the cited passages are identical.

States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government...." 11 U.S.C. § 101(21). The PUC is "an independent administrative commission...." 66 Pa.Cons.Stat.Ann. § 301(a) (Purdon 1979). It is therefore an "agency ... of ... a State" and constitutes a "governmental unit" for purposes of the Bankruptcy Code.

Plaintiffs have not claimed that PECO's actions may be the subject of section 525's prohibitions. *But cf. In re Webb,* 38 B.R. 541, 545 (Bankr.E.D.Pa.1984) (suggesting that a utility's termination of service might violate section 525). Therefore, plaintiffs' section 525 claim focuses exclusively on the PUC's refusal to exercise jurisdiction. It does not focus on PECO's refusal to negotiate a payment agreement without PUC compulsion to do so.

### B. *Grounds for Discrimination*

Throughout this litigation, the PUC has based its defense to plaintiffs' section 525 claim upon the theory that the PUC's "good faith" in adopting the policy announced in *Anyanwu* makes section 525 inapplicable. The PUC contends that it refuses to exercise jurisdiction to require utilities to negotiate repayment agreements with chapter 7 debtors because the PUC views that activity as appropriate to the bankruptcy court. The PUC contends that it refused to exercise jurisdiction in order to further the bankruptcy laws' intention that all of a bankruptcy debtor's affairs be consolidated in one, federal, forum. Even if the PUC erred in its reading of 11 U.S.C. § 366(b), the PUC contends that this misreading cannot constitute a section 525 violation.

■ Section 525 makes no mention of the "good faith" or intent of the governmental unit charged with discrimination. Section 525 prohibits all discrimination in

the provision of benefits within the section's scope if that discrimination arises "solely because such bankrupt or debtor is or has been a debtor under" the Bankruptcy Code. 11 U.S.C. § 525. The PUC concedes, as it must, that it refuses to exercise jurisdiction over repayment agreement negotiations between chapter 7 debtors and their utilities "solely because" the utility consumer "is a debtor" under the Bankruptcy Code. For that reason, I adhere to my statement of June 11 that "I do not doubt that a good faith discrimination prohibited by section 525 would nonetheless constitute a section 525 violation." *In re Begley,* 41 B.R. 402, 407 (E.D.Pa.1984).

### C. *The Nature of the Benefit Withheld*

In a growing body of case law, federal courts have developed the *Perez* rule under the aegis of section 525.[8] Several courts have considered whether financial responsibility restrictions of driver's licenses violate section 525. *See generally,* Annot., 68 A.L.R.Fed. 137, 145–150 (1984). For example, in *Henry v. Heyison,* 4 B.R. 437 (E.D. Pa.1980), Judge Newcomer held that section 525 precluded Pennsylvania from requiring drivers to prove their financial responsibility if they had not satisfied an outstanding tort judgment, even if that judgment had been discharged in bankruptcy. By contrast, the Court of Appeals for the Sixth Circuit has held that section 525 was not transgressed by Ohio's enforcement of a statute requiring drivers who had not satisfied a tort judgment within thirty days of that judgment's entry to prove their financial responsibility. *Duffey v. Dollison,* 734 F.2d 265 (6th Cir.1984). The court reasoned that satisfaction of the debt, reaffirmation of the debt, or discharge of the debt in bankruptcy did not relieve a driver of the burden of proving financial responsibility, so the statute did not interfere with the fresh start policy of the Bankruptcy Code.

---

**8.** This development has been laid out in a useful annotation to a report of *In re Rose,* 23 B.R. 662,

68 A.L.R.Fed. 128 (Bankr.D.Conn.1982). *See* Annot., 68 A.L.R.Fed. 137 (1984).

Courts have also considered the denial of building permits in the context of section 525. *See generally*, Annot., 68 A.L.R.Fed. at 150–152. *In re Island Club Marina, Ltd.*, 38 B.R. 847 (Bankr.N.D.Ill.1984), for example, involved a challenge to a municipality's attempt to invalidate a chapter 11 debtor's building permits. The court reasoned that "the licensing agency cannot refuse a permit based solely upon the fact that a debtor has sought relief under the Bankruptcy Code." 38 B.R. at 854.

Like driver's licenses and building permits, student loans and transcripts from state institutions have been held to be items as to which state discrimination may frustrate the Bankruptcy Code's "fresh start" policy. Thus, Judge Hannum has concluded that a state may not refuse to grant a student loan solely on the ground that the loan applicant has been a bankruptcy debtor, although the state may conduct an independent investigation of the applicant's creditworthiness. *In re Richardson*, 27 B.R. 560 (E.D.Pa.1982). Similarly, a state educational institution may not withhold transcripts as a means to induce students to reassume loans discharged in bankruptcy. *See, e.g., In re Reese*, 38 B.R. 681 (Bankr.N.D.Ga.1984); *see generally*, Annot., 68 A.L.R.Fed. at 143–145. Our Court of Appeals has held that section 525 does not apply to a state university's action in withholding a transcript for nonpayment of a student loan *not* discharged in bankruptcy, but that court's reasoning is not incompatible with the holdings of other courts that a transcript is a "similar grant" for purposes of section 525. *Johnson v. Edinboro State College*, 728 F.2d 163 (3d Cir.1984).[9]

In another instance of the construction of "similar grant" to mean items rather different from *Perez*'s driver's license, a bankruptcy judge has held that the New Haven Housing Authority could not evict a public housing tenant for nonpayment of a rent obligation discharged in bankruptcy. *In re Gibbs*, 9 B.R. 758 (Bankr.D.Conn. 1981). And another bankruptcy judge has stated that denial of a subsidized mortgage solely on the basis of an unpaid debt discharged in bankruptcy violates section 525 because that mortgage was a "similar grant." *In re Rose*, 23 B.R. 662 (Bankr.D. Conn.1982) (denying relief on other grounds).

This development of the *Perez* rule has had as its focus the protection of the bankruptcy laws' "fresh start" policy. *See* S.Rep. 989 at 81; *Johnson v. Edinboro State College*, 728 F.2d at 164–165. The only action which may be the subject of section 525 is discrimination of a sort which can frustrate the "fresh start." Judicial concern with the "fresh start" has therefore resulted in the application of section 525 to discrimination in the provision of direct governmental benefits such as driver's licenses, building permits, subsidized student loans, transcripts from public universities, subsidized leases, and subsidized mortgages. None of these subjects of discrimination closely resembles the indirect benefit denied to the Begleys by the PUC's refusal to exercise its jurisdiction in this case.

The PUC's jurisdiction is of limited intrinsic value to a utility customer. By exercising its jurisdiction, the PUC does not guarantee that a utility will, in fact, enter into a payment agreement. The utility will only enter into that agreement if "the size

---

**9.** In *Johnson* the court reasoned that section 525 only protects bankruptcy debtors from discrimination on the basis of the nonpayment of dischargeable debts. The court distinguished *In re Heath*, 3 B.R. 351 (Bankr.N.D.Ill.1980), and *In re Ware*, 9 B.R. 24 (Bankr.W.D.Mo.1981):

> The distinction between *Heath* and *Ware* and the case presented by Johnson is patent: the debts owed by *Heath* and *Ware* were dischargeable and, in fact, had been discharged; the debt Johnson owes Edinboro is not dis-

chargeable. Consequently, we can find no basis in the Bankruptcy Code to nullify Edinboro State's policy of withholding transcripts from those students who have made no payments on their educational loans, have not approached the college to arrange a more flexible repayment schedule, and have not had their debts discharged.

728 F.2d at 166. I take this discussion as implying that the Court of Appeals did not disagree with the *Heath* and *Ware* opinions.

716

of the unpaid balance, the ability of the ratepayer to pay, the payment history of the ratepayer and the length of time over which the bill accumulated" make a reasonable payment agreement feasible. *See* 52 Pa.Admin.Code § 56.97(b) (Shepard's 1983). The informal complaint of itself has little value to the customer; only the payment agreement as an alternative to termination has value. Therefore, the PUC's informal complaint jurisdiction does not have the directness in the provision of government benefits evident in the provision of benefits that other federal courts have found to be "similar grants" within the meaning of section 525.[10]

Further, plaintiffs in this case challenge only the PUC's refusal to exercise jurisdiction to enforce the utilities' obligation to negotiate reasonable payment agreements before terminating customers for *post*-bankruptcy-petition arrearages in chapter 7 cases. In a chapter 7 case, the debtor begins afresh from the date of the "order for relief," the bankruptcy petition. *Perez* and its progeny have sought to ensure that the state does not discourage bankruptcy filings by burdening the debtor in the post-petition period with a pre-petition legacy. *Perez* specifically addressed itself to the state's attempt to induce bankruptcy debtors to reassume discharged obligations. *Cf. Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984) (reassumption does not affect statutory disability, hence no inducement to reassume, hence no section 525 violation).

The PUC's refusal to exercise jurisdiction in this case has no such effect. It does not induce a debtor to reassume discharged or dischargeable obligations; the PUC's policy as challenged here pertains only to post-petition, hence nondischargeable, obligations. *Cf. Johnson v. Edinboro State*

*College*, 728 F.2d 163 (3d Cir.1984) (student loan not dischargeable, hence denial of transcript based upon nonpayment of student loan not prohibited by section 525). Moreover, the PUC's policy does not burden the post-petition period based upon pre-petition activity in a way which frustrates the "fresh start." A "fresh start" is provided by the petition. From that point on, a utility customer may remain current in his utility bills and suffer no adverse consequences under the PUC's policy. Only if the customer again falls behind in his or her payments does the PUC's policy impose any burden. This cannot be said substantially to frustrate the "fresh start" policy of the Bankruptcy Code, a policy which assumes that the debtor will regain his solvency upon the filing of the petition.

For these reasons, I find that the PUC does not violate section 525 when it declines to enforce utilities' obligations to negotiate reasonable payment agreements with chapter 7 bankruptcy debtors, during the pendency of bankruptcy proceedings before terminating the debtors' utility service for failure to remain current on their post-petition utility bills.

### III. APPROPRIATE RELIEF

In my June 11 Memorandum I held that section 366(b) did not preclude enforcement of those portions of chapter 56 of the Pennsylvania Code which pertain to negotiated payment agreements. On the basis of that holding, I issued a declaratory judgment against the private defendant, PECO. I further held that the Pennsylvania regulations imposed an obligation upon PECO to negotiate a payment agreement with plaintiffs. I therefore ordered PECO to comply with state law.

**10.** The PUC's refusal to enforce utilities' obligation to negotiate payment agreements with those customers who have filed in bankruptcy does not abrogate the utilities' obligation so to negotiate. Of course, the utilities' obligation does customers little good if they have no forum to enforce that obligation. However, utility customers may have at least one substitute forum. 66 Pa.Cons.Stat.Ann. § 3309 (Purdon 1979), arguably creates an action for damages in the court of common pleas for breach of a utility's obligation to negotiate. Exhaustion of the administrative remedy may not be required for this action if the PUC will not exercise jurisdiction. *See Nagy v. Bell Telephone Co. of Pa.*, 292 Pa.Super. 24, 436 A.2d 701 (1981). This alternative forum may not provide a realistically available remedy, however, because of the costs and delays of suit.

I have today held that, although the public defendants have misread section 366(b) of the Bankruptcy Code, that misreading did not constitute a violation of section 525. A consequence of my holding that section 366(b) does not tie the PUC's hands may, however be that the PUC is now obligated, under its own regulations, to assume jurisdiction in plaintiffs' case. Plaintiffs consequently demand two forms of relief against the PUC. First, plaintiffs demand a declaratory judgment as to the preemptive effect of section 366. Second, plaintiffs seek mandatory relief ordering the PUC to comply with its own regulations.

In January of this year the Supreme Court decided *Pennhurst State School & Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). That case explicated the caution with which a federal court should proceed in entertaining a suit against a state. Specifically, the Supreme Court held that the Eleventh Amendment bars a federal court from entertaining a suit for prospective injunctive relief against a state where the suit is based exclusively upon state law, notwithstanding that the Amendment might not bar a suit for prospective injunctive relief based upon federal law. *Pennhurst,* 104 S.Ct. at 910–911 (distinguishing *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), and *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)).

*Pennhurst* requires this court to examine plaintiffs' claim for an authoritative declaration of section 366 separately from plaintiffs' claim to enforce their state rights. As our Court of Appeals has held:

> That jurisdiction exists as to other claims in the case is inconsequential—the principle applies as well to state law counts brought into federal court under pendent jurisdiction. [*Pennhurst,*] 104 S.Ct. at 916–20. A federal court, therefore, must examine whether jurisdiction over that claim is barred by the Eleventh Amendment.

*ALCOSAN,* 732 F.2d 1167, 1173 (3d Cir. 1984) (footnote omitted). This court has jurisdiction to consider plaintiffs' federal claim for an authoritative construction of a federal statute. This court has no jurisdiction to entertain plaintiffs' claim that PUC should be directed to abide by its own regulations.

■ Plaintiffs' claim against the PUC for mandatory relief has no basis in federal law other than plaintiffs' rejected claim under section 525 or plaintiffs' rejected claim under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Because I have determined that the PUC is entitled to judgment on both of those claims, plaintiffs can only argue that state law requires the PUC to exercise its jurisdiction over their dispute with PECO. This is precisely the sort of claim that the Supreme Court held was improper in *Pennhurst* and which our Court of Appeals held was improper in *ALCOSAN.* Therefore, the Eleventh Amendment requires dismissal of plaintiffs' claim for mandatory relief against the PUC.

The accompanying Order, then, grants the PUC's motion for summary judgment on plaintiffs' claim under 11 U.S.C. § 525. In addition, the accompanying Order denies plaintiffs' claim under state law for mandatory relief against the PUC requiring the PUC to exercise jurisdiction over plaintiffs' dispute with PECO. However, the accompanying Order grants plaintiffs' motion for summary judgment on their claim for declaratory relief against the PUC.

Plaintiffs moved for class certification in the bankruptcy court. I have reserved that motion pending resolution of plaintiffs' substantive claims. In light of the disposition of their substantive claims, the plaintiffs may desire to renew their motion for class certification, or they may desire to abandon that motion. Accordingly, the accompanying Order establishes a schedule for submission and briefing of a renewed motion for class certification.